UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GEORGE E. THOMAS, JR.,<br>9338 Clifford Dr.<br>White Plains, MD 20695<br><br>  *Plaintiff*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>  *Defendant*.<br><br>Serve: CARL RACINE<br>Office of the Attorney General<br>400 6th St. NW<br>Washington, DC 20001 | Case No.<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Comes now Plaintiff, George Thomas (hereinafter "Plaintiff" or "Det. Thomas"), by and through undersigned counsel, with his Complaint for injunctive and compensatory relief, and states as follows:

## INTRODUCTION

Plaintiff is a credentialed Detective in the Metropolitan Police Department (hereinafter "MPD"). He has been a police officer for more than thirty-three years. For the past twenty-two years he has been a Detective, first in the Criminal Investigative Division (hereinafter "CID"), then in the Narcotics and Special Investigations Division (hereinafter "NSID"). In December of 2019, Det. Thomas, along with some of his fellow Detectives, filed a complaint about racial discrimination in the testing and promotion of detectives. Approximately a month later, his

1

specific statement was shared with management by the EEO Director, Alphonso Lee. Immediately thereafter, Det. Thomas began to be retaliated against by his management team.

In May of 2020, the retaliation had intensified, and Det. Thomas sent out a text message containing a prayer to his colleagues in the major crimes unit of NSID. The prayer was related to challenges of the retaliation that he and others were facing from management in NSID, and more specifically about the hostile work environment for African American officers. Shortly after sending out the text message, Det. Thomas was scolded by his superior Officer, then Captain, but now Commander John Branch (hereinafter "Cdr. Branch") for doing so. Days later, Det. Thomas was involuntarily transferred back to CID.

Thereafter, Det. Thomas was the subject of continuous and escalating retaliation, that culminated in his demotion and return to patrol activities. Det. Thomas herein asserts that MPD violated his civil rights and discriminated against him for statutorily protected activity. He now brings claims pursuant to the Civil Rights Act of 1889, 42 U.S.C. § 1981, by and through § 1983, Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act, D.C. Code § 2-1401.1, *et seq*.

As a direct result of the ongoing disparate treatment and disparate pay, the hostile work environment, and the systematic retaliation that Det. Thomas has had to endure, he has suffered financial losses, loss of reputation, and severe and escalating emotional and mental anguish. He now seeks injunctive and compensatory relief of not less than $1,100,000.00.

**PARTIES**

1. Plaintiff is an African American man, and resident of the State of Maryland. He has been employed by MPD for more than thirty-three (33) years.

2.      Defendant is a municipality.  MPD is a department of that municipality, under the control of the Mayor of the District of Columbia, and its City Council.

## JURISDICTION AND VENUE

3.      This honorable Court enjoys diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332, because Plaintiffs is a resident of Maryland, while Defendant is a municipal department of the District of Columbia, and the amount in controversy is in excess of $75,000.  This Court also enjoys federal question jurisdiction over the Plaintiff's claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"); and the Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981 by way and through 42 U.S.C. § 1983.  Venue is proper in this Court because all acts and omissions in controversy took place in the District of Columbia.

## FACTS

4.      Plaintiff was first hired by MPD in October of 1988, as a cadet.  Then he became a recruit officer in 1991, assigned to the Sixth District (hereinafter "6D").

5.      Plaintiff became an Investigator in 2000, and then was promoted to Detective in 2001.  He remained at 6D until 2003.

6.      In 2003, Plaintiff transferred to NSID, and remained a detective in that unit until he was involuntarily transferred to CID in May of 2020.

7.      In late January or early February of 2017, Plaintiff took the promotional exam to make Detective-Grade 1.  To his recollection, Plaintiff ranked number 44 out of approximately 68 test-takers. In late November or early December of 2018, Plaintiff took the promotional exam to make

3

Detective-Grade 1. To his recollection, Plaintiff ranked approximately number 68 out of approximately 70 test takers.

8. Plaintiff, and some other detectives who had taken the test, were concerned about the testing practices, and got together to compare the 2017 promotional test, with the 2019 test.

9. Plaintiff partnered with Detective Ucrania Paniagua (hereinafter Paniagua), Detective Sabrina Young ("hereinafter "Det. Young"), Detective Simon Yammine (hereinafter "Det. Yammine"), Detective Kimberly Crosby-Scott (hereinafter "Det. Crosby-Scott"), and a few others to raise concerns with management about the way that the testing and selection was disfavoring Detectives of color who over forty (40) years of age.

10. Plaintiff submitted a written statement to Equal Employment Opportunity (hereinafter "EEO") Department head Alphonso Lee (hereinafter "Mr. Lee"), which he believed was the basis his claim of race and age discrimination.

11. A few weeks after submitting his statement, Plaintiff was informed by Det. Paniagua that his statement was being treated as a supporting for her claim, rather than a claim of its own.

12. In his discussions with Dets. Paniagua and Young, Plaintiff learned that they were being retaliated against, and essentially being treated as if they had engaged in misconduct for having complained about the test.

13. Thereafter, Plaintiff began to notice a significant change in the way his superiors were treating him at NSID. He observed a noticeable chill in their treatment of him, which eventually deteriorated into obvious retaliation.

14. In late February or early March of 2020, Det. Paniagua informed Plaintiff that Mr. Lee attempted to convince her and the other Detectives who had made complaints, that they did not

4

have a real case, and that he further indicated that management had been provided the complainants' written statements.

15. Plaintiff immediately recognized that this improper revelation of his complaint and written statement by Mr. Lee was the cause for the change in his leadership team's treatment of him.

16. After the conversation with Det. Paniagua, Plaintiff became the subject of blatant and consistent retaliation, which included: false claims against him, significant decrease in assignments, hyper-scrutiny of his work, derogatory comments, a significant change in assignment to prohibit him from continuing his expert witness duties, an involuntary change in his work schedule, and a relocation of his work location from a private office to a hallway.

17. At the time that the retaliation was being leveled against Plaintiff, there were several other complainants who were also being targeted for retaliation, and they were expressing extreme dismay and anger.

18. On or about May 1, 2020, Plaintiff decided to send them a text message with a prayer, to help them get perspective and to calm down and refrain from doing anything that would have long term consequences.

19. The prayer acknowledged and addressed the hostile work environment that management had created, and that Plaintiff and others were enduring.

20. The text was only sent to the NSID major case detectives with whom Plaintiff was regularly interacting.

21. One of the officers who received the text was displeased about it, and showed the text message to the NSID Assistant Commander, Cpt. Branch, and the Division Commander, John Haines (hereinafter "Cdr. Haines").

22. On or about May 5, 2020, Plaintiff was approached by Cpt. Branch in the hallway, at which point Cpt. Branch indicated he wanted to talk to Plaintiff privately.

23. Cpt. Branch then ushered Plaintiff into the office that Plaintiff was in the process of vacating, and began chastising him for sending out the prayer about the hostile work environment that management had created.

24. Cpt. Branch told Plaintiff that sending out the prayer was inappropriate, and that Plaintiff should not take any management actions or decisions personally. Plaintiff decided it was in his best interest to keep his thoughts to himself, and he did not engage Cpt. Branch further on the matter.

25. However, for his own protection, and in light of the retaliation he was being subjected to, Plaintiff recorded the conversation with Cpt. Branch.

26. A few days later, Plaintiff was involuntarily transferred to CID of the First District (hereinafter "1D"), and forced to drop all of the cases that he was working on at NSID. The move came as a shock and devastating disappointment to him.

27. Once he arrived at 1D, he was told that he could no longer have the weekends off, and that he was no longer allowed to have a fixed, consistent schedule, and further told that he could not have the 9:00 am- 5:00 pm schedule that he had at NSID. This significantly affected his family life and ability to plan the care for his family, including caring for an ill and elderly parent.

28. Instead, Plaintiff was placed in a position where he was constantly shifting between all three schedules, including having to work the midnight shift, which created a substantial hardship on him and his family.

29. Plaintiff asked management for refresher training on CID investigations, because the work he had been doing for almost twenty (20) years was specialized, and of a different nature than the patrol criminal investigations. Management refused to provide him with the training he sought.

30. For months thereafter, Lieutenant Shawn Rooney (hereinafter "Lt. Rooney"), and Sergeant Joseph Trainor (hereinafter "Sgt. Trainor"), both of whom are white, repeatedly denied Plaintiff training on 1D CID investigations, asserting that Plaintiff should have recall from his previous stint as a CID investigator.

31. As a result of this disconnect, Sgt. Trainor and Lt. Rooney were constantly criticizing Plaintiff's work, alleging that he was writing too much, putting much detail into his reports and investigations, and taking too long with his cases. It is important to note that for years, Plaintiff was working in major crimes involving narcotics, which demanded that he be thorough and detailed in his investigative writing.

32. In September of 2020, Plaintiff and another African American female officer were on shift when news was spreading about the Ahmaud Aubery assassination in Georgia. Then, one of their co-workers, Detective Charles Viggiani (hereinafter "Det. Viggiani") started walking around the workspace asking who had the Ahmaud Arbery case, in a mocking and disrespectful tone, making fun of the situation.

33. Det. Viggiani behavior was so offensive that several Detectives left the area to avoid him, and Det. Karen Taylor-Arikpo (hereinafter "Det. Taylor-Arikpo") stormed out of the building, nearly in tears. Plaintiff reached out to Det. Taylor-Arikpo later that evening and learned that she was hurt and extremely angry about Det. Viggiani making light of the Aubery assassination.

7

34. Det. Taylor-Arikpo reported the incident to Sergeant Nicole Copeland (hereinafter "Sgt. Copeland"), and thereafter the MPD EEO department got involved. Shortly thereafter, it was announced that all of the 1D Detectives were to undergo EEO training.

35. Because of the varying shift in 1D, Mr. Lee of the EEO Department, conducted multiple trainings in order to speak to detectives while they were on shift.

36. At one of the trainings, Plaintiff ended up speaking with Mr. Lee, who tried to persuade Plaintiff to provide a written statement about what had happened to him at NSID, not about the incident with Det. Viggiani. Mr. Lee was insistent and made several representations to Plaintiff that his complaint would be taken seriously.

37. On at least three occasions, Plaintiff declined to provide a written statement. However, Plaintiff agreed to give Mr. Lee his email and phone number. The following day, Mr. Lee sent Plaintiff an email demanding that Plaintiff submit a written statement to him.

38. Thereafter, Plaintiff received no less than twenty (20) phone calls from people within the EEO department demanding that Plaintiff provide them with a written statement.

39. Due to Plaintiff's observations of the retaliation that other complainants who had gone to EEO endured, Plaintiff had decided that he did not want to participate in anything with EEO. However, after a long, heartfelt conversation with an EEO counselor, Harry Carter (hereinafter "Mr. Carter"), Plaintiff agreed to provide a written statement, and admitted that he had a recording of the conversation with Cpt. Branch.

40. After much additional discussion with Mr. Carter, Plaintiff sent Mr. Carter an email statement that contained an electronic version of the recording. This took place in October of 2020.

41.     In December of 2020, Mr. Lee terminated Mr. Carter. The facts around that termination are developed fully in *Carter v. District of Columbia*, Case no. 1:22-cv-00426 (JMC), a pending federal case in which all EEO officers who worked for Mr. Lee at the time have sued him for various violations, and accused him of forcing them to alter investigations to advance and favor management objectives.

42.     After terminating Mr. Carter, Mr. Lee initiated a disciplinary investigation of Plaintiff for recording Cpt. Branch. At the time, there was no MPD policy or prohibition on recording conversations. District of Columbia law also does not prohibit such recordings.

43.     In later February or early March of 2021, Plaintiff was contacted by IAD to give a statement regarding the recording of Cpt. Branch. In March of 2021, Plaintiff provided a statement in the investigation.

44.     On or about May 5, 2021, Plaintiff was placed on a Performance Improvement Plan (hereinafter "PIP"), alleging that Plaintiff was taking too much time to investigate cases. This was the first PIP Plaintiff had ever been placed in during his twenty-two (22) year career as a detective.

45.     In May of 2021, Plaintiff was served with a disciplinary packet that informed him he would be suspended for twenty (20) days for the recording. Plaintiff appealed the suspension, which resulted in the suspension being reduced to fifteen (15) days, with five days being held in abeyance.

46.     A few days prior to being served with his suspension, Plaintiff was assigned a major crime investigation by himself, involving a victim who had been stabbed in the back on a Saturday night.

47.     Plaintiff completed the investigation in a timely manner and submitted it to Sgt. Trainor for approval Sunday morning, before leaving for his two days off (Sunday & Monday). Sgt. Trainor accepted and approved the investigative report.

48.     Despite having worked around the clock for days, Lt. Rooney interrupted Plaintiff's day off on Sunday to obtain a statement from him about why his investigative report took more than twelve hours to complete. Instead of being able to rest and spend time with family, and go to church, Plaintiff took the time to submit a statement about the reasons his investigation took approximately twelve (12) hours.

49.     When Plaintiff returned to work on Tuesday, Lt. Rooney demanded that Plaintiff submit a second statement justifying the time it took to complete the investigation on the stabbing.

50.     The next day, Lt. Rooney went into Plaintiff's office while Plaintiff was seated and working, stood over Plaintiff, moved into Plaintiff's personal space, and began aggressing on Plaintiff, trying to goad Plaintiff into a physical altercation.

51.     In response, Plaintiff moved his seat back to create distance between himself and Lt. Rooney, and shut down and said nothing, for fear that he would lose his temper and say or do something he would regret. It is against MPD policy for superiors to use threats of physical violence, menace, or physical intimidation to manage their subordinates.

52.     Immediately after the altercation with Lt. Rooney, who was clearly trying to upset Plaintiff, Plaintiff was served with a fifteen-day suspension, with five days held in abeyance, for having recorded Cpt. Branch.

53.     Thereafter, Plaintiff was off work serving the suspension. When he returned to work, Lt. Rooney refused to allow him to be credentialled and restored to full duty. The day that Plaintiff returned to work, he was informed by the Director of the Police and Fire Clinic (hereinafter "PFC"), Matt Miranda (hereinafter "Mr. Miranda") that he had to report to the PFC for a psychological fitness for duty examination.

54. Nothing transpired during Plaintiff's suspension, or in the days prior to it, to have warranted referral for a fitness for duty evaluation.

55. From early August of 2021 to November of 2021, Plaintiff was forbidden from returning to full duty because he was being sent to multiple psychological screening appointments.

56. At the last appointment, on or about November 18, 2021, the PFC psychologists recommended to go back to full duty. MPD did not put Plaintiff back to full duty until early January of 2022. No explanation was given for the delay in returning to work.

57. When he returned to full duty, he received a letter stating that he was being demoted to officer, and would no longer be a detective, and that he would be involuntarily transferred to the Fourth District Patrol Section (hereinafter "4D").

58. Plaintiff was also informed by letter that he had been "overpaid" for 33 years, because he was erroneously credited for his time as a cadet, and that MPD was going to claw-back the alleged overpayment of wages due to erroneous seniority calculation, which further affected his pay.

59. Plaintiff asserts that the alleged overpayment is fictitious, and another act of retaliation based on engaging in protected activity.

60. Plaintiff asserts that the taking of his pay months before such a reduction was allowed under the terms of the MPD collective bargaining agreement with the police union was an act of retaliation.

61. Plaintiff filed an appeal of the demotion to the Office of Employee Appeals. He also filed an EEOC charge alleging race discrimination, and retaliation.

## **CLAIMS**

COUNT I

**(Violation of 42 U.S.C. Section 1981, enforced via Section 1983
Based on a Violation of the Fifth Amendment to the Constitution as
Applied to the District of Columbia)**

62. Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

63. Plaintiff is an African American male, and as such is a member of a protected class.

64. Plaintiff was subjected to disparate terms and conditions of employment than his white counterparts, and was subjected to a hostile work environment because of his race, African American.

65. Plaintiff engaged in protected activity when he participated in an investigation of a dispute between management and several non-white detectives, in which the detectives were claiming that they were being treated unfairly because of their race.

66. Plaintiff was subjected to involuntary transfer of departments, constant harassment and bullying, unfair evaluation of his work, suspension, demotion and unfair taking of his pay, because he engaged in protected activity in which he complained of race discrimination.

67. Because the Cadet program is targeted at recruitment and training of predominantly African American residents of the District of Columbia, the policy of not giving officers retirement credit for their service to the City in the Cadet program is discriminatory based on race.

68. Plaintiff's suspension and demotion were unvarnished acts of race discrimination in violation of 42 U.S.C. § 1981, and as a direct and proximate cause of these actions, he has suffered lost wages, lost benefits, damage to his reputation, mental anguish and emotional stress.

69. Plaintiff seeks to enforce his rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

70. Plaintiff asks this Court to award him compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000.00.

71. Plaintiff also asks this Court for declaratory judgment reinstating him to the rank of Detective, a correction to his retirement annuity and calculation to include his time as a Cadet, removal of all disciplinary actions from his record, and all other remedies the Court deems appropriate to make him whole.

## COUNT II

### (Violation of Title VII of the Civil Rights Act of 1967 42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.* Race Discrimination -- Retaliation)

72. Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

73. Plaintiff is an African American male, and as such, is a member of a protected class.

74. Plaintiff was subjected to disparate terms and conditions of employment than his white counterparts, and was subjected to a hostile work environment because of his race, African American.

75. Plaintiff engaged in protected activity when he participated in an investigation of a dispute between management and several non-white detectives, in which the detectives were claiming that they were being treated unfairly because of their race.

76. Plaintiff was subjected to involuntary transfer of departments, constant harassment and bullying, unfair evaluation of his work, suspension, demotion and unfair taking of his pay, because he engaged in protected activity in which he complained of race discrimination.

77. Because the Cadet program is targeted at recruitment and training of predominantly African American residents of the District of Columbia, the policy of not giving officers retirement credit for their service to the City in the Cadet program is discriminatory based on race.

78. Plaintiff's suspension and demotion were unvarnished acts of race discrimination, and as a direct and proximate cause of these actions, he has suffered lost wages, lost benefits, damage to his reputation, mental anguish and emotional stress.

79. Plaintiff asks this Court to award him compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $300,000.00.

80. Plaintiff also asks this Court for declaratory judgment reinstating him to the rank of Detective, a correction to his retirement annuity and calculation to include his time as a Cadet, removal of all disciplinary actions from his record, and all other remedies the Court deems appropriate to make him whole.

## COUNT III

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.* Religious Discrimination -- Retaliation)**

81. Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

82. Plaintiff exercised his free speech rights by expressing his faith and sharing a prayer with a small group of colleagues. In so doing, Plaintiff revealed his Christian faith.

83. Plaintiff was subjected to disparate terms and conditions of employment than his counterparts, and was subjected to a hostile work environment because of his expression of religious belief.

84. Plaintiff engaged in protected activity when he complained about the retaliation he was enduring because of an expression of religious belief.

85. Plaintiff was subjected to involuntary transfer of departments, constant harassment and bullying, unfair evaluation of his work, suspension, demotion and unfair taking of his pay, because of his status as a Christian.

86. Defendant harbored animus toward Plaintiff because he expressed his belief that what management was doing to him and others was contrary to Christian teaching.

87. Plaintiff's suspension and demotion were unvarnished acts of discrimination based on religion, and as a direct and proximate cause of these actions, he has suffered lost wages, lost benefits, damage to his reputation, mental anguish and emotional stress.

88. Plaintiff asks this Court to award him compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $300,000.00.

89. Plaintiff also asks this Court for declaratory judgment reinstating him to the rank of Detective, and all other remedies the Court deems appropriate to make him whole.

## JURY TRIAL

Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted,

_____/s/Pamela M. Keith
Pamela M. Keith [Bar No. 448421]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Tel: (202) 800-0292
Fax: (202) 807-5275
pamkeith@centerforemploymentjustice.com

*Counsel for Plaintiff*

*Counsel for Plaintiff*